# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LEWIS TING, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 03 C 3927 |
| CHICAGO MERCANTILE EXCHANGE, INC., | ) Judge Joan B. Gottschall |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Lewis Ting has sued his former employer, Chicago Mercantile Exchange, Inc. ("CME"), charging it with race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. In its answer to Ting's complaint, CME has counterclaimed for breach of fiduciary duty, destruction of personal property, conversion and replevin. Presently before the court is CME's motion for summary judgment, the parties' cross motions for summary judgment on the counterclaim counts, cross motions for sanctions under FED. R. CIV. P. 11(c) and a motion to strike. As set forth below, CME's motion for summary judgment is granted, its cross-motion for summary judgment on the counterclaim is granted in part and denied in part, and the parties' remaining motions are denied.

## I. BACKGROUND[1]

---

[1] The following background is taken from the parties' Local Rule 56.1 statements. In keeping with the acrimonious nature of this litigation to date, there has been substantial disagreement about both a number of facts relied on by the parties and the manner in which those facts have been disputed under LR 56.1, culminating in a 34 page motion to strike filed by Ting. The court will not rule separately on each of Ting's objections, but notes that facts have been considered only in those instances where the parties have complied with LR 56.1 and the court's Standing Order Regarding Motions for Summary Judgment.

**A.     Ting's Employment at CME.**

Defendant CME operates a futures exchange, employing approximately 1,100 individuals. In March 2000, CME entered into a two-year employment agreement with Lewis Ting, an Asian-American male. Ting joined CME as a member of the management team, and his duties included oversight of human resources and employee development. As part of Ting's compensation package, the parties' employment agreement called on CME to pay Ting a minimum bonus of $200,000 a year. CME paid Ting $200,000 in bonuses in 2000 and $300,000 in 2001; however, the latter payment represented a reduction from Ting's proposed bonus that year, which had been pegged at $450,000. CME reduced the bonuses of several members of the management team that year, but Ting's reduction was the most significant, allegedly because CME did not view human resources management as requiring the same degree of difficulty as other management positions.

In early 2002, Jackie Fitzgerald, one of Ting's subordinates, complained to the legal department that Ting had behaved in a manner constituting harassment, retaliation and creation of a hostile work environment. CME hired outside counsel Babbitt and Melton LLP to investigate the allegations. Babbitt and Melton interviewed several individuals, including Ting, in connection with the investigation and issued a report containing its findings (the "Babbitt and Melton Report") to CME's president and CEO James McNulty. Although the Babbitt and Melton Report concluded that no harassment or retaliation had occurred, it faulted Ting's management style.[2]

Fitzgerald was not the only individual with whom Ting had a strained relationship during

---

[2] Ting asks this court to exclude the report on hearsay grounds. Although Ting is correct that the report is not admissible for the truth of the matter asserted–namely, its conclusion that Ting was a poor manager–it is still admissible as evidence of the documentation CME had before it at the time it was making the decisions that gave rise to this action.

his tenure at CME. Leo Melamed, CME's Chairman Emeritus and a Senior Policy Advisor, was often dismissive of Ting, speaking to him in an "aggressive, speaking down, commanding tone," and, on one occasion, instructed him to get coffee in preparation for a meeting (a task apparently beneath any member of CME's management team). In addition, Melamed claimed that he had trouble understanding Ting on at least one occasion, and denigrated Ting's "note-taking" ability in front of others. According to Ting, Melamed's hostility towards him was motivated both by certain corporate governance changes Ting was attempting to institute as well as by Ting's race. Ting was the only member of the management team whose note-taking ability was criticized or who was asked to get coffee.

William Miller, a consultant and former director at CME, had similar interactions with Ting, though the record is somewhat shorter on specifics. At one point, Miller and Ting had what the parties characterize as an "abusive conversation," the upshot of which was that Ting called Miller "unprofessional" and questioned his qualifications to provide consulting services to CME. Ting concedes that he was "direct and confrontational" in his dealings with Miller, but maintains that he was motivated to act in this manner to protect a manager in his department whom Miller had criticized. According to a declaration filed by Ting after the close of discovery, McNulty told him that the confrontation with Miller was a "set-up," but CME objects to this statement on hearsay grounds. CME is correct. *See* FED. R. EVID. 801(c)(defining hearsay as a statement made by an out-of-court declarant offered to prove the truth of the matter asserted); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)("Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Courts can consider affidavits such as Ting's at the summary judgment stage, but only when "the affiant's ... testimony would be admissible if he

were testifying live." *Eisenstadt,* 113 F.3d at 742. Ting would not be permitted to testify as to this statement allegedly made by McNulty. Ting's attorney took a lengthy deposition of McNulty after the alleged statement occurred and he had ample opportunity to question him about the putative "set-up" of his client, but has provided the court with no confirming sworn testimony by McNulty. The court cannot consider what Ting now says McNulty said to him about the confrontation.

**B.    Ting's Termination and CME's Post-Termination Investigation.**

CME did not renew Ting's employment contract when it expired in March 2002, and Ting remained an at-will employee at CME until some point in August, when CME terminated his employment. CME maintains that it terminated Ting because of morale problems, including the confrontation with Miller, and because of Ting's failure to "advance the interests of CME's Board of Directors." Ting concedes that the Board was dissatisfied with certain corporate governance recommendations he made,[3] but maintains that its dissatisfaction was animated by a discrimination against him based on his race. Ting's replacement was Beth Keeve, a Caucasian woman.

According to Ting, CME initially indicated that it would "do the right thing" and provide him with separation benefits upon his departure, but CME ultimately declined to do so after determining that he had been terminated "for cause." CME also conducted a post-termination investigation into Ting's conduct while an employee, and concluded that Ting had requested excessive work from and authorized excessive payments to Penfield Associates, Inc. ("Penfield") (a consulting firm with whom Ting had close ties), improperly retained outside legal counsel on

---

[3]    Ting brought a separate suit in Illinois state court alleging that his termination was improper retaliation for making corporate governance recommendations that would have alleviated conflicts of interest at CME. The court in that case granted CME's motion to dismiss. *See Ting v. Chicago Mercantile Exchange, Inc.*, No. 02 L 14905 (Cir. Ct. Cook Cty. Nov. 19, 2004).

CME's behalf, deleted information from the hard drive on the laptop issued to him by CME, and retained certain documents and notebooks belonging to CME. Ting denies that his dealings with any outside organizations were improper, but he does not dispute that he deleted information from his laptop hard drive or that he retained certain documents that CME claims are its property.

After his termination and CME's refusal to pay separation benefits, Ting filed the present action, which maintains that CME's decisions regarding his termination, bonus and severance as well as comments directed toward him while an employee violated Title VII (Count I) and 42 U.S.C. § 1981 (Count II). CME has counterclaimed, alleging claims of breach of fiduciary duty (Count I), destruction of personal property (Count II), conversion (Count III), and replevin (Count IV).

## II. SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party opposing summary judgment may not rest upon the pleadings, but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id*. The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

### A. Discrimination Under Title VII and Section 1981.

Ting may prove his employment discrimination case either by direct or indirect evidence.

Direct evidence "essentially requires an admission by the decision-maker that his actions were based on ... prohibited animus," *Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 599 (7th Cir. 2003), and is "rarely found." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). When a plaintiff lacks direct evidence, he may utilize the burden-shifting method of proof established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination by demonstrating that he: (1) belongs to a protected class, (2) performed his job to his employer's legitimate expectations, (3) suffered an adverse employment action despite performing satisfactorily, and (4) received less favorable treatment than similarly-situated employees outside the protected class. *Hildebrandt v. Ill. Dep't of Nat'l Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003). If the plaintiff succeeds, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its conduct; and if the defendant succeeds, the burden shifts back to the plaintiff to show that the defendant's reasons were pretextual. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004). Although the *McDonnell Douglas* analysis was developed for Title VII employment discrimination claims, its analytical approach is applicable to Ting's Section 1981 discrimination claim as well. *See Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 806 (7th Cir. 1999).

### 1. Termination, bonus and separation benefits claims.

The parties agree that Ting has no direct evidence of discrimination, so Ting must proceed under the *McDonnell Douglas* burden-shifting approach to prove his discrimination claims. CME first contends that Ting cannot meet his *prima facie* burden with respect to his termination because he cannot meet the second prong of *McDonnell Douglas*. According to CME, Ting cannot show that he performed his job satisfactorily because the Board honestly believed that Ting was not an

effective worker and caused morale problems. This argument fails at the *prima facie* stage because Ting has raised fact questions as to the objective quality of his job performance. For example, Ting cites his most recent performance evaluation, in which he was given a favorable rating, and emphasizes that his confrontation with Miller was motivated by a desire to defend the subordinate Miller allegedly criticized.

CME also argues that Ting cannot meet the fourth prong of *McDonnell Douglas* because he cannot show that someone outside the protected class who was similarly situated was treated more favorably, noting that the management styles of other members of the management team were not subject to criticism similar to that contained in the Babbitt and Melton Report. However, in several discharge cases such as this, the Seventh Circuit has replaced the "similarly situated" inquiry with an inquiry into whether the "employer sought a replacement for [the plaintiff]." *See, e.g., Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999)(discriminatory discharge based on national origin); *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993)(same). Because there is no question that Keeve replaced Ting on CME's management team, the court finds that Ting has made a *prima facie* case as to discriminatory termination.

Since Ting has made his *prima facie* case, the burden shifts to CME to articulate a non–discriminatory reason for his termination, which it has done, and then back to Ting to demonstrate a question of fact as to whether the Board's proffered reasons for his termination were pretext. Ting faces an uphill battle here, as he already has admitted that the Board did not like his corporate governance recommendations. Moreover, Ting does little to cast doubt on the bona fides of CME's proffered reasons for termination even had he not conceded the corporate governance issue. For example, Ting objects that CME did not "get his side of the events" surrounding his

confrontation with Miller, but does not explain why CME was required to do so.  The fact that CME terminated an employee who admittedly confronted and challenged the competency of Miller (who previously had served as a director at CME) without first conducting a detailed investigation might be evidence of rashness or even unfairness, but it does not suggest that the termination decision was a pretext to get rid of Ting because of his race.[4]  CME is required to provide only "an honest reason [for termination], not necessarily a reasonable one." *Flores v. Preferred Tech. Group*, 182 F.3d 512, 516 (7th Cir. 1999).  The court grants summary judgment as to the allegations of discriminatory termination.

CME also contends that its decisions regarding Ting's 2001 bonus and failure to provide severance benefits fail at the *prima facie* stage.  Here, CME has the better of the argument.  With respect to the bonus, CME was required to pay Ting $200,000, and it exceeded this obligation by an additional $100,000.  Ting maintains that the action nevertheless was adverse because he originally was promised an even larger bonus, but this argument fails because denial of a discretionary bonus (or, in this case, the failure to provide a larger discretionary bonus than the one awarded) is usually not an adverse employment action.  *See, e.g., Hunt v. City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000)(denial of a raise constitutes adverse employment action but denial of discretionary bonus does not); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000)("[L]oss of a bonus is not an adverse employment action in a case ... where the employee is not automatically entitled to the bonus.")(quoting *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir.

---

[4] Perhaps recognizing this defect, Ting repeatedly emphasizes that McNulty allegedly told him the confrontation with Miller was a "set up," but his continued reliance on this alleged fact only highlights why it should have been elicited in McNulty's deposition rather than submitted as hearsay in a declaration after the close of discovery.

1996)). Ting does not attempt to distinguish Seventh Circuit precedent, nor marshal any argument beyond his initial assertion that the extra $100,000 he received was not sufficient.

Moreover, even assuming that Ting can meet his *prima facie* case, his claim would still fail because he could not show that the articulated reasons for denial of the bonus were pretext. Ting does not dispute that several management team members had their 2001 bonuses reduced because CME felt that "bonuses were too high for everyone" that year. Ting objects that his reduction was the most significant, but CME counters that this was because Ting's position lacked the skill and expertise required by the other positions. Ting maintains that this proffer should fail because CME's executive committee, including McNulty, did not specifically recall the factors considered by the committee in setting the 2001 bonuses. Perhaps not, but as McNulty's deposition testimony demonstrates, he recalled enough. McNulty observed that "[t]he overall feeling was that [Ting's position] did not have the realm of technical difficulty as clearing and technology, and that although a lot of this was accomplished, that the – that it should be reduced. I think I described it once as the difficulty of the dive." McNulty Dep. 120:15-21. Ting offers no evidence disputing the sincerity of CME's belief that his position was less demanding. In fact, the bonus data provided by Ting suggests the opposite: Ting was slated to receive the smallest bonus of any member of the management team even before CME reduced the bonuses. Summary judgment is granted with respect to Ting's bonus claim.

Ting's final claim that his denial of separation benefits was actionable discrimination fails for much the same reason. *See, e.g., Helzing v. Loyola University of Chicago*, No. 02 C 9408, 2004 WL 1881780, at *10 (N.D. Ill. Aug. 16, 2004)(refusal to give severance benefits when such benefits were not required to be paid is not an adverse employment action). And as above, even if Ting had

proved his *prima facie* case, he cannot show that CME's stated reasons for refusing to provide the benefits (which are the same as the reasons for termination since CME maintains that its policy is not to provide separation benefits for employees who are involuntarily terminated for cause) are pretext. Ting is not entitled to have this claim proceed to trial.

### 2. Hostile Work Environment.

CME also maintains that Ting's hostile work environment claim cannot survive summary judgment. To succeed on his hostile work environment claim, Ting ultimately must show that "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004). Ting bases his claim on an instance where former CME chairman Leo Melamed "directed" Ting to get coffee in preparation for a meeting, and on multiple instances where Melamed and Miller allegedly made denigrating remarks about Ting's ability to speak and write, including his "note taking" ability. In his deposition, Ting singled out the following alleged statements, which he maintains were made in an "aggressive, speaking down, commanding tone":

- "[T]here's no coffee, get the coffee"

- "[W]hat, moral? Morale? What are you talking about?" [in response to a comment by Ting that morale was low].

- "Lewis, are you taking notes?"

- "I don't want to be misquoted. I want a copy of your notes. Why are you taking notes?"

- "Make sure you take this down correctly. That was a beauty I just did."

-10-

Given the relative mildness of the discriminatory conduct that Ting has alleged, no reasonable jury could find that these statements created an environment that was hostile or abusive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)(Cautioning that the standard for judging hostility must be "sufficiently demanding to ensure that Title VII does not become a 'general civility code'" and noting that "discourtesy or rudeness should not be confused with racial harassment.")(internal citations omitted). In fact, Ting himself testified that he took offense only to the comment about the coffee. This admission alone dooms his claim: a hostile work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id*. at 787. Even assuming that the comment about coffee was hostile and abusive, one offensive comment is too isolated to constitute actionable severe or pervasive harassment. *Patt v. Family Health Sys.*, 280 F.3d 749, 754 (7th Cir. 2002)(isolated incidents and offhand comments did not amount to hostile work environment).

Ting's claim also fails for the equally fundamental reason that he cannot demonstrate that the alleged harassment was based on his race. *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999) (noting, with regard to comments such as "get your head out of your ass" and "dumb motherfucker" that "these verbal outbursts [do not] implicate negative attitudes toward African-Americans. It cannot be said with any degree of certainty that the character of these remarks was discriminatory."). Ting posits that the comments must have been race-based because he was the only person to whom such comments were directed and the only person of Chinese ancestry, but the mere fact that he was allegedly "singled out" for an offensive comment, without more, is not evidence that the comments were racially motivated. *Blakely v. Brach & Brock Confections, Inc.*, 181 F. Supp. 2d 943, 947-48 (N.D. Ill. 2002) (observing that, without evidence

of race motivation, merely calling an African American plaintiff a "dumb, stupid idiot" was racially neutral even if same language was not directed to white employees) (citing *Williams v. Caterpillar Inc.*, No. 89 C 8581, 1991 WL 113189, at *3 (N.D. Ill. June 20, 1991)). CME's motion for summary judgment is granted in its entirety for the reasons stated above.

### B. CME's Counterclaim.

Both of the parties have moved for summary judgment on CME's counterclaim, which alleges breach of fiduciary duty, destruction of personal property, conversion and replevin. CME first claims that, as a result of Ting's breach of his fiduciary duty, it has suffered damages in excess of $877,936. The core of this allegation ($864,936 worth) involves payments made by CME to Penfield, a consulting firm retained by Ting that performed various consulting services for CME from late 2000 to late 2002. Stephen Strelsin, a consultant at Penfield who did much of the consulting work at issue, had been friends with Ting for a long time and, according to CME, this relationship colored Ting's dealings with Penfield. Specifically, CME maintains Ting failed to comply with policies requiring written contracts before hiring Penfield, authorized excessive and duplicative invoices to Penfield, and then attempted to cover up his alleged wrongdoing.

Ting concedes that CME policy requires a written contract with outside consultants to prevent excessive payments and to ensure protection of confidential information, and that at least some of the work performed by Penfield was not done pursuant to this policy. However, Ting maintains that this rule was not enforced in practice, and cites several instances in which consulting firms provided services to CME without a written contract. CME does not seriously contest these examples, but nevertheless maintains that it was entitled to enforce its policy with respect to the Penfield work. The record reflects that at one point, Ting asked McNulty about the legal

documentation that would be required to work with Penfield, and McNulty told him "you have to find out what the policy is ... use your common sense." The parties dispute the import of McNulty's testimony, but this only underscores that there are fact questions as to the extent to which the Penfield services were authorized by CME. Neither party is entitled to summary judgment on CME's claim that Ting breached his fiduciary duty by failing to obtain written contracts in violation of CME policy.

Much of the remaining dispute over Ting's relationship with Penfield concerns whether Ting permitted what CME considers excessive billings, but this determination rests, at least in part, on the scope of the initial work agreements, an inquiry that is secondary to the determination of whether CME authorized the agreements in the first place. Even if this were not the case, experience has amply demonstrated the perils of dismissing fractions of a single count and trying the remainder. *Accord Ambre v. Joe Madden Ford*, 881 F. Supp. 1187, 1193 (N.D. Ill. 1995)("[A]n order granting summary judgment must dispose of an entire claim as opposed to a single portion of the claim."). CME maintains that Ting has breached his fiduciary duty in other similar ways, including by authorizing work for a law firm with which he had close ties, but resolution of these issues likewise must wait until trial. Both parties' motions for summary judgment on Count I of the counterclaim are denied.

Count II of the counterclaim charges Ting with destruction of property, specifically by deleting information on the hard drive of a company laptop issued to him by CME. Ting concedes that he deleted the information at issue, but, as is often the case, it appears that this action did not permanently erase the electronic files, but rather only told the computer that the space occupied by the files was now free to use for other purposes. *See, e.g.*, Bruce Schneier, Applied Cryptography

(2d ed. 1996) at 228-29 ("When you delete a file on most computers, the file isn't really deleted... Many software vendors have made a fortune selling file-recovery software that recovers files after they have been deleted."). CME was able to recover the files at issue, but now wants Ting to pay the reasonable cost of the data recovery, which CME maintains was $13,400.

Ting contends that the restoration was unnecessary because information he deleted was readily available from other electronic sources, including a hard drive in the laptop's docking station and on a network server. CME disputes whether the laptop docking station had a hard drive or whether the network server actually backed up the data in question, but its FED. R. CIV. P. 30(b)(6) designee on this issue was unable to provide many specifics. CME maintains that any discussion of any potential alternative locations for the data is moot because Ting admitted deleting the files. The court disagrees. It may well be that CME knew or should have known that the same data was still readily available from other sources (a question that the record before the court does not address), which would call into question the propriety of performing a costly data recovery operation. Neither side is entitled to summary judgment on this count.

Finally, Count III of the counterclaim charges Ting with refusing to turn over certain documents allegedly belonging to CME, and Count IV requests that this court order Ting to return them. Ting concedes that he is in possession of the notebooks and employment agreements at issue, but nevertheless maintains that he does not have to give them back. His primary contention is that CME is not harmed by his retention of the documents and the litigation should not continue on these issues based on the doctrine of *de minimis non curat lex*. This argument fails because Ting has not demonstrated that the information contained in the papers (which he allows contain notes from CME meetings) is without value; perhaps the papers contain trade secrets or other sensitive information.

Ting argues that there is a protective order that would govern disclosure of such information to third parties, but this court has no intention of retaining jurisdiction over this action forever.

More fundamentally, the *de minimis* doctrine would not mandate summary judgment even if the notebooks and other papers taken from CME were blank, for the simple reason that "the doctrine is not intended for definite losses, however small, inflicted by definite wrongs," including taking another's property. *Hessel v. O'Hearn*, 977 F.2d 299, 304 (7th Cir. 1992). As the Seventh Circuit has explained:

> The law does not excuse crimes or torts merely because the harm inflicted is small. You are not privileged to kill a person because he has only one minute to live, or to steal a penny from a Rockefeller. The size of the loss is relevant sometimes to jurisdiction, often to punishment, and always to damages, but rarely if ever to the existence of a legal wrong.

*Id.* at 303. Ting's contention that he does not have to return items he concedes belong to CME because they may be of limited value is without merit.

Ting makes two other arguments in support of his assertion that he should not be required to return the disputed materials, but these are easily disposed of. The first is that copies of all the original documents at issue were produced to CME during discovery, so Ting is not impermissibly withholding information that belongs to CME. This argument fails because, in cases where "the owner does not have the original[] [documents] and the alleged converter has the originals or the only known copies of the originals, the retention of such property–to the exclusion of the owner– constitutes conversion." *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 304 (7th Cir. 1990). The second argument is that Ting wrote "personal information" in certain of the notebooks (such as references about calling his mother and friends) which he maintains makes them his property. This contention likewise is without merit. "[I]nformation and records compiled by an employee as

-16-

part of his job ... are property of the employer and may be retained by the employer upon termination of the employment relationship." *Long v. Arthur Rubloff & Co.*, 27 Ill. App. 3d 1013, 1025, 327 N.E.2d 346 (1st Dist. 1975). At best, Ting might have a colorable case for retaining his own personal information, but the court does not understand how this would divest CME of ownership of documents otherwise created by Ting in the scope of his employment. For the reasons stated above, this court grants CME's request for an order returning the documents retained by Ting after he was terminated.

CME also briefly asserts that it is entitled to punitive damages on the conversion claim, contending that Ting's refusal to return its documents was malicious. The court looks to Illinois state law for guidance as to whether punitive damages should be allowed. *Masi v. Ford City Bank & Trust Co.*, 779 F.2d 397, 399 (7th Cir. 1985). Under Illinois law, punitive damages "may be awarded when torts are committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others ... . [W]hile the measurement of punitive damages is a jury question, the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law." *Id*. at 400 (citations omitted). The court cannot make a definitive finding as to willfulness since the issue was not fully briefed by either party. If CME wants punitive damages, it will have to provide a separate filing fleshing out the facts surrounding its demand for return of the documents as well as Ting's refusal, and explaining more fully why it believes Ting's refusal was so egregious it warrants punishment. Ting must return the documents he generated or obtained during the course of his employment with CME, but the remainder of the parties' cross motions for summary judgment on CME's counterclaim is denied.

## III. RULE 11 SANCTIONS

Finally, both parties have moved for sanctions under Rule 11(c). Rule 11 provides that by presenting documents to the court, an attorney is certifying to the best of his or her knowledge that (1) they are not being presented for any improper purpose, (2) the claims and contentions are warranted by existing law, and (3) the allegations and factual contentions have evidentiary support. *U.S. Bank Nat'l Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465, 469-70 (7th Cir. 2005). Monetary sanctions are appropriate when a party has filed documents with an improper purpose or when its arguments are frivolous. *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir. 1988).

CME first argues that sanctions are appropriate because neither Ting nor his counsel honestly believed that Ting was terminated due to his race. CME notes that Ting filed a separate state court complaint in which he maintained that he was improperly terminated for making corporate governance recommendations at CME that would have alleviated conflicts of interest, and maintains that Ting's counsel admitted to Magistrate Judge Ashman that this was the real reason Ting believed he was terminated. However, Ting's counsel's statements in front of Judge Ashman only summarize the theory of liability in the state court complaint, and this is not tantamount to an admission that race had nothing to do with Ting's termination. It is possible that Ting believed that he was terminated both for making corporate governance recommendations that his employer disliked and because of his race; the two motives are not mutually exclusive, and may even be causally related. The evidence before the court is insufficient to conclude that Ting brought this action for an improper purpose.

CME also argues that sanctions are appropriate because his arguments are completely lacking in evidentiary support. CME's argument largely repeats its summary judgment argument,

but "[t]he fact that the underlying claim turned out to be groundless does not necessarily mean that Rule 11 sanctions are appropriate (much less required)." *Corley*, 388 F.3d at 1014. Rather, the district court may consider "the case as a whole" when determining whether sanctions are appropriate. *Id*. Here, the court does not think that Ting's failed claims, taken together, rise to the level of a Rule 11 violation. In fact, had Ting properly elicited testimony from McNulty regarding his alleged statement that the termination was a "set up," Ting may have survived summary judgment. The failure to obtain this evidence may well have cost Ting the case, but in the court's view does not warrant the imposition of sanctions.

Ting likewise brings a Rule 11 motion, alleging that each count in CME's counterclaim was brought for an improper purpose and without evidentiary support. CME objects that Ting's motion was brought merely to "balance" the proceedings, and this argument probably has some merit. Ting even copies portions of CME's Rule 11 motion wholesale in his own papers, complete with CME's puzzling citations to obscure, unpublished cases in the Fourth and Ninth Circuits. Ting points to no evidence in support of his assertion that CME's counterclaim was brought for an improper purpose other than his own speculation that the post-termination investigation underlying the counterclaim was conducted solely to "raise the stakes and intimidate" him, so this argument must fail. Similarly, there is no evidence that the counterclaim were completely lacking in evidentiary support; CME marshaled enough evidence to survive summary judgment as to the first two counts of the counterclaim and obtained summary judgment as to the remainder. Ting's Rule 11 motion is denied.

## IV. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted, its cross motion for summary judgment on its counterclaim is granted as to Counts III and IV and denied as

-19-

to Counts I and II, and its Rule 11 motion is denied. Plaintiff's motions for summary judgment on defendant's counterclaim and for Rule 11 sanctions are denied.

        ENTER:

        /s/
        Joan B. Gottschall
        United States District Judge

Dated: September 21, 2005